# EXHIBIT A

| Approved, SCAO | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN<br>Kent County (17th) Circuit Court | SUMMONS | CASE NO.<br>22- 01309 CB |
|---|---|---|

| Court address<br>180 Ottawa NW, Ste. 2400, Grand Rapids, MI 49503-2703 | | Court telephone no.<br>(616) 632-5480 |
|---|---|---|

| Plaintiff's name(s), address(es), and telephone no(s).<br><br>**UNIVERSAL WIRELESS, INC. and<br>MARCECO LTD.** | v | Defendant's name(s), address(es), and telephone no(s).<br><br>**T-MOBILE USA, INC. d/b/a T-MOBILE<br>c/o CSC-LAWYERS INCORPORATING SERVICE<br>(COMPANY)<br>2900 WEST ROAD STE 500<br>EAST LANSING, MI 48823** |
|---|---|---|
| Plaintiff's attorney, bar no., address, and telephone no.<br>**James R. Peterson (P43102)<br>MILLER JOHNSON<br>45 Ottawa Ave. SW, Suite 1100<br>Grand Rapids, MI 49503<br>(616) 831-1700<br>petersonj@millerjohnson.com** | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☒ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

| SUMMONS |
|---|

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>FEB 1 1 2022 | Expiration date<br>MAY 1 3 2022 | Court clerk<br>LISA POSTHUMUS LYONS |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

**MC 01** (9/19) **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

MJ_DMS 34240703v1 40250-3

| **PROOF OF SERVICE** | **SUMMONS** |
|---|---|
| | Case No.  **22-**                              **CB** |

TO PROCESS SERVER:  You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons.  You must make and file your return with the court clerk.  If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), that:  (notarization required) |

☐  I served personally a copy of the summons and complaint,

☐  I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____

List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| **T-MOBILE USA, INC. d/b/a T-MOBILE** | **c/o CSC-LAWYERS INCORPORATING SERVICE (COMPANY) 2900 WEST ROAD STE 500 EAST LANSING, MI  48823** | |
| | | |

☐  I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | TOTAL FEE | Name (type or print) |
| $ | | $ | $ | |
| | | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.

Date

My commission expires: _____  Signature: _____

Date                                          Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____

Attachments

_____ on _____

Day, date, time

_____ on behalf of _____.

Signature

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

UNIVERSAL WIRELESS, INC. and
MARCECO LTD,

               Plaintiffs,

    v.

T-MOBILE USA, INC. d/b/a T-MOBILE,
and SPRINT SOLUTIONS, INC. d/b/a
T-MOBILE,

               Defendants.

Case No. 22**01309** CB

## COMPLAINT

---

James R. Peterson (P43102)
MILLER JOHNSON
Attorneys for Plaintiffs
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI  49503
(616) 831-1700
petersonj@millerjohnson.com

---

Plaintiffs Universal Wireless, Inc. ("Universal Wireless") and Marceco Ltd ("Marceco")
(collectively, "Plaintiffs") complaining of Defendants T-Mobile USA, Inc. d/b/a T-Mobile
("T-Mobile") and Sprint Solutions, Inc., d/b/a T-Mobile ("Sprint") (each a "Defendant" and
collectively "Defendants"), allege the following:

### OVERVIEW

1.    This action seeks redress for Defendants' fraudulent, predatory, and anti-
competitive conduct and abuse of franchisees located in Michigan.

2.    Defendants successfully schemed to use dishonesty and abuse of economic
hardships they had created to extract revenue from authorized dealers of their products and services
to line Defendants' and their executives' respective coffers.

3.    Defendants then forced those dealers, mostly small and medium sized businesses,
out of the marketplace at unreasonably low values in transactions over which T-Mobile exerted

improper influence – all to the detriment of consumers, the local and national economy, fair competition, and the dealers and their employees.

4.     T-Mobile has manipulated and weaponized the commercial and contractual relationship as part of a pattern and practice of:

a.     Lying (affirmatively and by concealment) to trick dealers into entering into contracts with terms that T-Mobile then misconstrues and misapplies to disadvantage the dealers;

b.     Imposing and conspiring to impose simultaneous economic pressure that leaves dealers with no legitimate choice, other than insolvency, but to sign T-Mobile's documents – all while providing unreasonably short deadlines to review only portions of T-Mobile's documents before signing those documents and allowing no edits to the same;

c.     Cheating the dealers out of promised and anticipated store numbers, compensation, and levels of operation, and diverting compensation to T-Mobile affiliates, and otherwise creating additional financial pressure;

d.     Slashing dealer stores – in the case of Universal Wireless, driving the store count down 31% from 96 to 68 open or projected to remain open at the time Universal Wireless essentially force-exited the market;

e.     Forcing a fire-sale to another favored T-Mobile dealer at prices that T-Mobile unlawfully acted to depress; and

f.     Attempting to evade responsibility for flagrant illegality with unlawfully induced and invalid putative releases, choice of law and forum selection provisions.

5.      Further, in the case of Universal Wireless, T-Mobile engaged in illegal conduct to prevent Universal Wireless from operating as a T-Mobile dealer while its corporate parent, Marceco, also owned a Boost Mobile prepaid wireless business, but concealed its intent to do so until after Universal Wireless signed T-Mobile's contracts as a result of T-Mobile's fraud, business compulsion, and duress.

6.      Seeking justice, Marceco and Universal Wireless bring this action to recover for their injuries.

## PARTIES, VENUE, AND JURISDICTION

7.      Plaintiff Universal Wireless is a corporation organized and existing under the laws of Michigan and with a principal place of business in Michigan.

8.      Plaintiff Marceco is a corporation organized and existing under the laws of Michigan and with a principal place of business in Michigan and is the sole shareholder of Universal Wireless.  Marceco is, in turn, owned by two individual Michigan residents.

9.      Before it encountered Defendants' predatory conduct, Universal Wireless had been in business for approximately 20 years and was a very successful Sprint dealer, operating wireless stores in Michigan, Wisconsin, North Dakota, Minnesota, Iowa, Colorado, New Mexico, Arizona, Arkansas, Alabama, and Florida.

10.     Further, at the time it was targeted for mistreatment by T-Mobile, Marceco owned one of the top Boost distribution operations in the country.

11.     Defendant T-Mobile is a corporation organized and existing under the laws of Delaware, with headquarters in Bellevue, Washington.

12.     Defendant Sprint is a Missouri corporation with its principal place of business in Overland Park, Kansas.

13.     Venue is proper in Kent County Circuit Court pursuant to MCL § 600.1621.

14.     This Court is a court of general jurisdiction and has subject matter jurisdiction over this matter because the amount in controversy exceeds $25,000 exclusive of interest, costs, and attorneys' fees.  This Court has jurisdiction over Defendants pursuant to MCL § 600.705.

## GOVERNING LAW

15.     The documents drafted by T-Mobile purport to make Washington law applicable.

16.     However, because the Sprint and T-Mobile relationships with Universal Wireless were disguised franchise relationships, the Washington choice of law provision is unenforceable against Universal Wireless. M.C.L. § 445.1527(f) ("A provision requiring that arbitration or litigation be conducted outside this state . . . is void and unenforceable if contained in any documents relating to a franchise."); *Lakeside Surfaces, Inc. v Cambria Co., LLC*, 16 F4th 209, 220 (CA 6, 2021) (internal citation omitted).

17.     The choice of law provision also is unenforceable as to Universal Wireless because the T-Mobile Retailer Service Agreements ("T-Mobile RSAs") were fraudulently and otherwise unlawfully induced.

18.     Universal Wireless thus has the right to proceed on any of its claims under the laws of any state, including Michigan, where Universal Wireless and Marceco had and have substantial operations or its headquarters.

19.     Further, to the extent Washington law is more favorable to Universal Wireless and Marceco, Plaintiffs reserve the right to proceed under, and T-Mobile is estopped from opposing, the application of Washington law.

## FACTUAL BACKGROUND

A.     **Background.**

20.     Dealers like Universal Wireless are private companies that enter into agreements with telecommunications carriers to sell the carrier's wireless products, accessories, and services

in retail stores owned and operated by the dealer.  Although the dealer owns its retail stores (often called the dealer's "doors" in the industry), the stores operate under the carrier's brand and to a consumer would appear to be a "T-Mobile" or "Sprint" store.

21.     The dealers are typically small to medium-sized and closely-held businesses like Universal Wireless, which help support the local economy, lease space for store locations, and provide numerous employment opportunities in the communities in which they are located – a high percentage of which are jobs for minorities and persons of color.

22.     Universal Wireless, like other dealers, sold wireless plans, cell phones, and cell phone accessories.

23.     For each wireless services plan it would sell, Universal Wireless generally would receive an initial commission ("commissions") and, thereafter, a monthly "continuing service award" ("CSA") or residual commission ("residuals").

24.     Dealers depend on these initial and residual commissions for their livelihood, to meet payroll, and to pay the leases and other continuing obligations related to their stores.

25.     As a cost for the supposed privilege of doing business with T-Mobile, T-Mobile cut commissions and residuals already earned by legacy Sprint dealers, including Universal Wireless.

26.     The dealers typically lease the physical locations for the stores.

27.     The best dealers find good locations for their stores and provide exceptional customer service to maximize sales to customers.

28.     Dealers undertake a significant financial commitment (and often personal guarantees by their principals) when they lease a store location, and a carrier's good faith and fair dealing in performing its end of the bargain is vital to the dealers' ability meeting their financial commitments.

29.     Defendants were, at all times relevant to this Complaint, aware of the financial commitments and challenges of being a wireless goods and services dealer.

**B.     Founding of Universal Wireless and Establishment of Universal Wireless' Relationship with Sprint.**

30.     Universal Wireless[1] was formed on November 3, 1999, over 22 years ago.

31.     On June 30, 2016, the shareholders of Universal Wireless and Marceco merged their business operations. Universal Wireless is now a wholly owned subsidiary of Marceco. Jamal Aqel and Dave DenHerder are the current shareholders of Marceco.

32.     Universal Wireless was a Nextel dealer for approximately 5 years before becoming a Sprint dealer.

33.     Marceco had a contractual relationship with Sprint (and now with Sprint's prepaid cellular successor, Dish Network, LLC and/or its subsidiaries and affiliates) to distribute Boost Mobile pre-paid cellular products since October 2004, and in fact, is the second largest Boost Direct Distribution Partner in the country.

34.     After Nextel and Sprint merged, Universal Wireless became an authorized Sprint dealer, converting its 18 Michigan Nextel doors to Sprint doors. Universal Wireless excelled as a wireless products, services, and accessories dealer expanding its retail store footprint across Michigan, Wisconsin, North Dakota, Minnesota, Iowa, Colorado, New Mexico, Arizona, Arkansas, Alabama, and Florida.

35.     On or about August 21, 2017, Sprint and Universal Wireless signed its most recent Authorized Representative Agreement ("ARA"), with a term of two (2) years which was to automatically renew at the end of the term.

---

[1] Mr. Aqel and his brothers initially owned Universal Wireless.  After the merger between Universal Wireless and Marceco, and prior to December 2020, Aqel brothers and Mr. DenHerder and his two children owned Marceco.

C.    **Universal Wireless Excelled as an Authorized Sprint Dealer and Expanded its Footprint at Sprint's Behest.**

36.    In 2017, Sprint and T-Mobile explored a highly publicized potential merger.

37.    The initial merger discussions failed, and immediately following the announcement that there would be no merger, Sprint contacted many of its dealers, including Universal Wireless, and actively encouraged them to "open as many stores as possible."

38.    At a dealer summit that took place January 29-31, 2018, Sprint strongly urged dealers, including Universal Wireless, to grow and add new locations, especially locations in close proximity to competing T-Mobile stores.  If the dealers needed to obtain financing or take on debt to open more stores, Sprint encouraged them to do so or find investors.

39.    Sprint consistently ranked Universal Wireless as one of its top national dealers in the country based on the national dealer scorecard produced by Sprint.

40.    In light of Universal Wireless' track record of success, Sprint specifically encouraged Universal Wireless to expand in markets that Sprint claimed had long-term "strategic" value or benefit to Sprint's plans.

41.    Over time, Universal Wireless grew to more than 100 stores and employed approximately 550 employees, which included numerous employees of color.

42.    Prior to the merger between Sprint and T-Mobile, Universal Wireless sold some of its stores. At the time Sprint and T-Mobile merged, Universal Wireless was a very strong and successful dealer with 96 stores.

D.    **While Encouraging Universal Wireless to Expand, Sprint Concealed Its Plans to Merge with T-Mobile.**

43.    Sprint knew that it would soon be acquired by T-Mobile but told Universal Wireless otherwise, assuring Universal Wireless (and other legacy Sprint dealers) that Sprint would remain "a stand-alone company." Indeed, Sprint's CEO Marcelo Claure specifically made this statement

in a November 6, 2017 email to Sprint's dealers, wherein he further outlined the "strong plan" he would implement "to grow Sprint as an independent company."

44.     Sprint concealed the truth about the merger from Universal Wireless (and other dealers) and repeatedly encouraged Universal Wireless to open and acquire new stores, and specifically encouraged Universal Wireless (and other dealers) to open stores that were in close proximity to T-Mobile stores.

45.     Despite Sprint's efforts to conceal its merger plans from dealers like Universal Wireless, rumors persisted in early 2018 that Sprint and T-Mobile might merge.

46.     When Universal Wireless inquired whether there would be a merger, Sprint indicated that there would not be and again instructed Universal Wireless to continue growing and opening new stores in close proximity to T-Mobile locations.

47.     Universal Wireless followed Sprint's instructions and continued opening new locations.

48.     On April 29, 2018, Sprint and T-Mobile announced that they had reached a definitive merger agreement.

49.     Upon information and belief, Sprint knew its prior statements to dealers about the merger were false and that its repeated urging of Universal Wireless (and other legacy Sprint dealers) to continue growing and opening new stores was solely to strengthen Sprint's and its executives' position in the ongoing (but concealed) merger negotiations, and would ultimately lead to the demise of dealers like Universal Wireless.

50.     To obtain the necessary approvals from the Department of Justice and regulatory agencies, T-Mobile made broad, sweeping promises to the government and to the public that the

merger would increase competition for consumers, result in the opening of new stores, and create approximately 100,000 new jobs and that it would not produce anti-competitive effects.

51.　Among other public appearances to promote the merger, Marcelo Claure and T-Mobile's CEO John Legere, jointly appeared on CNBC's "Squawk on the Street" program on April 30, 2018. During that joint appearance, they stated that the new proposed merger would create thousands of jobs and would result in hundreds and hundreds of new stores being opened. A link to the video of the program where these statements was made is here - https://www.cnbc.com/video/2018/04/30/T-Mobile-and-sprint-ceos-on-mega-merger.html. Mr. Claure's and Mr. Legere's statements on that program are incorporated by reference.

52.　Mr. Legere additionally stated that "The New T-Mobile will open **600 new stores to serve rural areas and small towns**" (emphasis in original) and that "we will offer a job with the New T-Mobile to every single employee of T-Mobile and Sprint working in one of our retail stores" following the merger during an April 4, 2019 posting to T-Mobile's website - https://www.T-Mobile.com/news/un-carrier/new-T-Mobile-creating-jobs, which statements are also incorporated herein.

53.　Messrs. Claure and Legere made these statements to induce Universal Wireless, and other legacy Sprint dealers, to continue following Sprint's growth plan and to induce Universal Wireless and other dealers to not oppose the merger or request that appropriate regulators deny or contest the merger.

54.　Messrs. Claure and Legere intended that Universal Wireless and other Sprint dealers rely on these representations in executing post-merger agreements with T-Mobile so they could complete their merger and enrich themselves, to the detriment of legacy Sprint dealers like Universal Wireless.

55.     Messrs. Claure and Legere also intended that Congress rely on these statements, as well as those made in other public appearances and interviews, because they knew the merger would be subject to scrutiny by Congress.

56.     In fact, Messrs. Claure and Legere reiterated their claims that the merger would not impact Sprint dealers and would in-fact result in more stores being opened, during joint testimony sessions to Congress on June 27, 2018 and February 19, 2019.

57.     Sprint concealed the truth that a merger would in fact occur from Universal Wireless (and other dealers) and repeatedly encouraged Universal Wireless to open and acquire new stores, and specifically encouraged Universal Wireless (and other dealers) to open stores that were in close proximity to T-Mobile stores.

58.     Sprint's lies, concealment of the truth, and wrongful manipulation of Universal Wireless (and other legacy Sprint dealers) were intended to benefit Sprint and its executives in the coming merger, and indeed they profited greatly as a result of the growth they fraudulently induced dealers to undertake — growth that the "New T-Mobile" intended to promptly dismantle and destroy once the merger transaction was complete.

E.     **Sprint and T-Mobile Merged, and T-Mobile Coerced and Fraudulently Induced Universal Wireless to Enter Into New Agreements Based on False Promises of Growth and Limited Post-Merger Closures.**

59.     Sprint and T-Mobile finalized the merger on April 1, 2020.

60.     On or about April 24, 2020, representatives from T-Mobile met with Universal Wireless to present T-Mobile's post-merger dealer strategy as it pertained to Universal Wireless.

61.     In the presentation, T-Mobile announced that it would close 23 of Universal Wireless' then-96 stores (approximately one-quarter of Universal Wireless' store count). Of these stores:

a.     16 stores were Universal Wireless-owned stores, and

b.      7 stores were so-called COR ("Corporate Owned Retail" stores, i.e., Sprint corporate stores that Sprint had asked Universal Wireless to take over, invest in, and operate).

62.      T-Mobile falsely represented that the store closures were based on extreme proximity to other T-Mobile stores and that T-Mobile was instituting a similar number of closures for legacy Sprint and T-Mobile dealers alike.

63.      T-Mobile did not mention the possibility of additional store closures beyond those 23 stores. Universal Wireless reasonably believed that these closures were the only closures T-Mobile would institute because T-Mobile's dealer strategy presentation to Universal Wireless – besides not mentioning any potential for more closures – was intentionally designed to give the impression there would be none.

64.      T-Mobile representative Doug Chartier assured Universal Wireless that it was "okay to shrink to regrow" and that T-Mobile wanted "best performers," like Universal Wireless, to be "well capitalized and in good financial position."

65.      Scott Keen and Cody Welker assured Universal Wireless' ownership that Universal Wireless would be "a growth partner" of T-Mobile's, that Universal Wireless "would be well taken care of" and that there "would not be" another round of closures.

66.      Scott Keen and Cody Welker added that Universal Wireless would be "one of the few chosen legacy Sprint dealer growth partners of T-Mobile," which they said was evidenced by T-Mobile offering the new Retailer Service Agreements ("T-Mobile RSAs") as a 5-year contract, which, they stated, was not generally being offered to other legacy Sprint dealers.

67.      On or about May 1, 2020, T-Mobile sent Universal Wireless a voluminous package of documents consisting of legally dense, lengthy contracts (the "Agreement Package") which

required Universal Wireless to wind down its existing Sprint ARA and enter into 12 new T-Mobile RSAs with T-Mobile. [2]

68.     The Agreement Package consisted of nearly 1,000 pages of complex legal documents.

69.     Worse still, the Agreement Package documents included numerous links to additional terms and conditions that Universal Wireless and Marceco were not permitted to access until after Universal Wireless signed the Agreement Package and became a T-Mobile dealer.

70.     Thus, the documents in the T-Mobile Agreement Package included references to and purported to incorporate terms, policies, and procedures that Universal Wireless was not permitted to access —— and therefore could neither read nor understand — until after it signed the T-Mobile Agreement Package.

71.     T-Mobile's unwillingness to provide access to the documents referenced in the T-Mobile Agreement Package demonstrates the coercive and fraudulent manner in which T-Mobile proceeded.

72.     Contemporaneously with its transmission of the Agreement Package, T-Mobile falsely represented to Universal Wireless that T-Mobile was not required to honor – and would not honor – Sprint's obligations under Universal Wireless' existing Sprint ARA, which obligations T-Mobile had assumed via the merger and by their terms would have remained effective as the Sprint ARA contained an automatic renewal clause.

73.     T-Mobile further falsely advised Universal Wireless that, because Sprint no longer existed, T-Mobile was not obligated to provide any benefits under the existing contracts and would

---

[2] The Agreement Package contained twelve (12) new T-Mobile RSAs, one for each market or "Area" where Universal Wireless operated retail locations.

not allow Universal Wireless to sell any T-Mobile phones or services unless it signed the Agreement Package.

74.     T-Mobile took the entirely opposite position with respect to Universal Wireless' burdens under the existing Sprint contracts (such as non-competition provisions), stating T-Mobile would continue to enforce those burdens against Universal Wireless until it signed the T-Mobile Agreement Package.

75.     T-Mobile coerced Universal Wireless to sign the T-Mobile Agreement Package documents quickly and repeatedly emphasized that all terms were non-negotiable. T-Mobile stated that to be an authorized dealer, Universal Wireless must sign these documents, thereby effectively presenting contracts of adhesion that, due to T-Mobile's fraud and deceptive conduct, Universal Wireless had no option but to sign and rely on T-Mobile's representations about its post-contract intentions.

76.     Universal Wireless had no legitimate option of suing T-Mobile to avoid signing the Agreement Package, because, if it did not, Universal Wireless would lack the cash flow from selling wireless services and products that it would have needed to fund litigation against T-Mobile and Sprint, which were, conversely, well capitalized to resist a challenge (and draw it out to punish Universal Wireless).

77.     The risk of taking on T-Mobile while trying to do business with it was significant because T-Mobile habitually retaliates against dealers that stand up to it.

78.     T-Mobile also stated that it would withhold the funds needed to remodel Universal Wireless' remaining stores to convert them to T-Mobile-branded locations if Universal Wireless did not execute the Agreement Package by May 8, 2020 (effectively giving Universal Wireless a 7-day deadline to read, understand, and execute 1,000 pages of legal documents or else risk having

a worthless business overnight, with no ability to sell products or services since T-Mobile was discontinuing the Sprint brand).

79.    At the time, T-Mobile misrepresented that it would allocate to Universal Wireless a certain amount to "refresh" its stores, which concealed the true cost.

80.    Even then, T-Mobile represented that it would only allocate the refresher costs to Universal Wireless if it signed the T-Mobile Agreement Package within a matter of days.

81.    Specifically, T-Mobile required all legacy Sprint dealers, including Universal Wireless, to refresh their stores under the new T-Mobile brand at a cost to the dealer of an undisclosed amount at the time, but which later information revealed would cost approximately $130,000 per store. At the time, T-Mobile misrepresented that it would allocate cooperating legacy Sprint dealers approximately $15,000 to refresh their stores.

82.    T-Mobile therefore gave Universal Wireless an unrealistic and impractical timeline to review and execute nearly 1,000 pages of non-negotiable agreements to be eligible to receive the remodel funds and continue operating or else, essentially, become bankrupt overnight.

83.    When Universal Wireless communicated its concerns about the Agreement Package, T-Mobile stated it does not entertain redlines and all documents were non-negotiable, effectively presenting contracts of adhesion that, due to T-Mobile's fraud and deceptive conduct, Universal Wireless had no option but to sign.

84.    A T-Mobile representative, Cody Welker, discouraged Universal Wireless and its principals from retaining counsel and applied pressure by fraudulently stating that Universal Wireless was "the only one" to not have signed the T-Mobile Agreement Package, which contained the putative releases.

85. As a practical matter, T-Mobile knew that Universal Wireless had no choice but to sign the new T-Mobile RSAs because T-Mobile would not allow it to go to another provider at all or to sell T-Mobile branded products and services unless Universal Wireless signed the Agreement Package.

86. This combination of circumstances would entirely deprive Universal Wireless of the ability to meet its monthly expenses of not less than $2.2 million in lease payments and utilities, payroll, taxes, and other ongoing monthly costs and expenses associated with its business operations.

87. Prior to signing the Agreement Package, Universal Wireless spoke with Scott Keen, Sprint's former Director of Dealer Channels, who had been promoted to a similar Director position at the new T-Mobile.

88. Specifically, in the second half of May 2020, Universal Wireless directly asked Mr. Keen whether T-Mobile would institute any additional rounds of store closures.

89. Mr. Keen assured Universal Wireless that T-Mobile would not engage in another round of closures.

90. According to T-Mobile's representatives, the single round of closures T-Mobile disclosed were part of a "shrink to grow" strategy, pursuant to which T-Mobile would close — on a fair and reasonable basis — stores that were in close proximity to one another and then allow dealers, like Universal Wireless, to grow by adding new locations in new areas.

91. Indeed, multiple T-Mobile representatives repeatedly assured Universal Wireless that T-Mobile was going to facilitate expansion and growth by Universal Wireless.

92. Upon information and belief, at the time T-Mobile represented there would be no further rounds of closures, T-Mobile knew, that it would make multiple additional rounds of *en*

*masse* closures of Universal Wireless stores, and T-Mobile fraudulently concealed this fact from Universal Wireless, including by instructing personnel like Mr. Keen and Mr. Welker, not to disclose the truth and to lie about closures to Universal Wireless and other dealers.

93.     T-Mobile concealed from Universal Wireless, that unless a dealer was a favored T-Mobile dealer, it would only be allowed (or more accurately, forced) to shrink, but never to grow.

94.     As Universal Wireless was not a favored legacy T-Mobile dealer, Universal Wireless experienced a mandated "shrink, but not grow" strategy forced upon it by T-Mobile.

95.     Prior to the merger, when the principals of Universal Wireless specifically inquired, Dow Draper, the Chief Commercial Officer for Sprint told the principals that Marceco would be allowed to continue as a Boost Direct Distribution Partner while at the same time, its affiliate Universal Wireless would be a T-Mobile dealer.

96.     The Boost issue was a significant item to Universal Wireless and its principals, and it pressed for confirmation from T-Mobile of the accuracy of Mr. Draper's statement.

97.     In response, T-Mobile kept indicating that it would discuss the matter after Universal Wireless signed the Agreement Package, and it continued to pressure Universal Wireless to sign the Agreement Package, specifically indicating that Universal Wireless was past the deadline to sign the Agreement Package.

98.     Universal Wireless signed the Agreement Package on May 14, 2020, because it had no other legitimate options: it faced with an immediate reduction of its business within weeks of the merger, the direct threat of having its remaining stores' operations grind to a halt with nothing to sell, the inability to negotiate terms, and relying on T-Mobile's representations that there would be no further rounds of store closures.

99.     The Agreement Package included several T-Mobile RSAs, the Wind Down Addendum to the Sprint ARA (the "Wind Down Addendum"), and personal guarantees from Universal Wireless' principals, Jamal Aqel and David DenHerder.

100.    Notably, T-Mobile falsely represented that Mr. Aqel and Mr. DenHerder would be subject to a corporate guaranty, not personal guaranties.

101.    However, T-Mobile forced Mr. Aqel and Mr. DenHerder to sign personal guaranties.

102.    Notably, T-Mobile untruthfully represented that Mr. Aqel and Mr. DenHerder were signing the personal guaranties on their own request, and T-Mobile unreasonably dismissed concerns that the personal guaranty was factually untrue and fraudulent, and forced them to sign a personal guaranty anyway.

103.    Universal Wireless only signed the T-Mobile Agreement Package under extreme economic duress, unwillingly, and further coerced by the lies T-Mobile told.

104.    The T-Mobile RSAs were one-sided, adhesion contracts, and as Universal Wireless now realizes, intended by T-Mobile to rapidly drive Universal Wireless out of business and not to facilitate a legitimate commercial enterprise.

**F.    Defendants' Material Representations and the Material Facts they Withheld about Marceco's Boost Business Were False.**

105.    As T-Mobile knew from the outset, T-Mobile never intended to allow Universal Wireless to operate a post-paid T-Mobile business and to allow Marceco to own a pre-paid Boost business.

106.    After running out the clock, evading discussions, and refusing to respond in good faith to Universal Wireless' and Marceco's requests for information about the Boost business, T-

Mobile indicated after the signing of the Agreement Package that it would not allow both a Boost and T-Mobile business under the same corporate umbrella.

107.    This was contrary to Mr. Draper's representations and contrary to T-Mobile's representations that T-Mobile was open to Marceco keeping the Boost dealership.

108.    At this time, Marceco was the second largest direct distribution partner on the Boost Mobile front.

109.    In connection with the misrepresentations about Boost, the power of the personal guaranties was an unmistakable badge of fraud and anti-competition.  Not only could T-Mobile execute its secret plan to force divestiture of the Boost or T-Mobile businesses, but it made Universal Wireless' and Marceco's principals personally liable if they did not either jettison the successful Boost business or their T-Mobile business.

**G.    The Wind Down Addendum's and T-Mobile RSAs' Oppressive Terms.**

110.    The Wind Down Addendum, the T-Mobile RSAs, and other documents in the Agreement Package include provisions that are false, unreasonable, and oppressive – particularly as T-Mobile construed them – including, without limitation:

> five year terms, which T-Mobile represented to be more than the usual 6-month term in recognition of the fact that  Universal Wireless was a top performing dealer when the reality was that T-Mobile knew the usual 6 months might not be long enough to dismantle top performing legacy Sprint dealers, including Universal Wireless, and T-Mobile wanted a longer period of obligations (non-competes and guarantees) so that these dealers and could not leave T-Mobile to sell a competing carrier's products in the near future;

> a.    an unexpressed (at the time of signature) view by T-Mobile that T-Mobile could avoid the limitation on termination for material, uncured default by supposedly

relying on other provisions of the T-Mobile RSAs to shut down Universal Wireless' business without any uncured default by Universal Wireless;

b.    a provision in the T-Mobile RSAs that either party can close a Universal Wireless store for any reason or no reason with at least 120-days' written notice, which T-Mobile ultimately abused as follows:

    (1) The T-Mobile RSAs limit this right for Universal Wireless only to situations in which T-Mobile approves of the closure.

    (2) The plain language, purpose, and intent of the provision was to allow for occasional, one-off closings of stores that were not performing well or were inconvenient to operate.

    (3) T-Mobile, however, adopted an untenable and unethical interpretation of the provision, claiming it authorized T-Mobile to impose broad "rounds" of closures of numerous Universal Wireless stores, as often and as numerous as T-Mobile desired for its own benefit, even if so rapid and financially ruinous to Universal Wireless that it would be forced to sell its remaining assets to avoid bankruptcy and without ever receiving a bona fide opportunity to be a T-Mobile dealer.

    (4) No rational or fair person could interpret the agreement this way, as indicated by the need for an entirely separate agreement just months prior — the Wind Down Addendum — to address merely the one-time imposition of such sweeping closures, nor would a rational dealer knowingly agree to such an illusory arrangement.

(5) Yet T-Mobile repeatedly threatened the abuse of this ordinary course closure provision, frequently including it in PowerPoint presentations after the dealers signed the RSAs and stating that T-Mobile thought it could pull a location at any time and provide the adversely affected dealer with only a limited amount of expenses relative to the store closure.

c.    a provision in the T-Mobile RSAs that placed Universal Wireless' ability to grow entirely in the hands of T-Mobile, which gave itself sole discretion to approve or reject Universal Wireless' attempts to open or acquire new store locations, and to approve or reject even the renewal of any existing Universal Wireless locations, thus making Universal Wireless' ability to survive in the wake of T-Mobile's closures dependent on T-Mobile's good faith and fair dealing, which, it turned out, would be non-existent;

d.    a broad covenant not to compete, which applies during the term of the T-Mobile RSAs and for one year afterwards and prohibits not only Universal Wireless, but also its principals and owners, and any successor entity, from competing with T-Mobile or its dealers in virtually any capacity;

e.    provisions that greatly reduced Universal Wireless' compensation, depriving it of, among other things, the residuals it had earned while also creating a less profitable platform than the Sprint ARA that the T-Mobile RSAs supplanted;

f.    provisions that supposedly permitted T-Mobile to divert commissions to one or more creditors of dealers, including Universal Wireless, who were T-Mobile affiliates, when those affiliated unfairly reduced the dealers' credit limits for the apparent purpose of obtaining those commissions;

g.  putative releases, which are invalid because they are the product of fraud, coercion, and improper duress created by T-Mobile,[3] and which no rational dealer would have signed voluntarily if T-Mobile had been truthful about its plans to rapidly dismantle the dealers' businesses and had not wrongfully manipulated the relationships to ensure that any attempt to stand up to T-Mobile guaranteed a dealer's insolvency;

h.  a putative exclusivity provision, which T-Mobile used as an improper basis to foreclose Marceco from operating the Boost business; and

i.  misrepresentations that the principals of Universal Wireless wanted to provide personal financial guaranties for the benefit of T-Mobile.

111.  Stated differently, T-Mobile closed all exit doors for any dealers who did not want to endure its ruinous activity; it impeded the free alienation of businesses and stifled legitimate competition in the marketplace.

**H.  T-Mobile Instituted Additional Closures Despite Representations to the Contrary, and Further Engaged in a Pattern and Practice of Anti-Competitive Behavior to Harm Universal Wireless and Drive it Out of Business.**

112.  In bad faith, T-Mobile weaponized the terms of the T-Mobile RSAs it coerced Universal Wireless to sign, imposing rapid and crippling numbers of store closures, which was contrary to T-Mobile's representations. Specifically:

a.  T-Mobile immediately closed the 23 stores subject to "wind down," representing approximately 24% of Universal Wireless' total stores.

---

[3] T-Mobile had a pattern and practice of applying improper financial and other pressure to coerce dealers' execution of purported releases, which evidences both T-Mobile's knowledge of its lies and forthcoming wrongdoing, and its attempt to use deceit and coercion to immunize itself from its fraudulent, unfair, and anti-competitive conduct.

b.      On or about November 19, 2020, approximately 6 months after T-Mobile assured Universal Wireless it would not be subject to additional closures, T-Mobile announced that it was instituting a second round of closures and would close 9 more of Universal Wireless' stores.

c.       T-Mobile also identified an additional 7 doors that would not be allowed to renew when their lease expired, but T-Mobile indicated these stores would be reevaluated for performance during the next door optimization discussion.

d.      The unexpected "second-round" closures represented 23% of the remaining Universal Wireless stores and brought the total stores impacted by closures or potential non-renewals (within 6 months of signing a 5-year term with T-Mobile) to 41% of Universal Wireless' stores.

113.    Regarding T-Mobile's excessive closures of Universal Wireless stores, T-Mobile engaged in misconduct, including among other things, the following:

a.      The initial closures were more than Defendants had represented and had given Universal Wireless reason to believe would occur;

b.      The November 2020 announcement was contrary to T-Mobile's explicit representations made by its Director Scott Keen in May 2020 in verbal communication with Universal Wireless' principals and the representations made by T-Mobile in a PowerPoint presentation T-Mobile provided to Universal Wireless.

c.      Upon information and belief, T-Mobile imposed the closures to prevent Universal Wireless from performing to its potential, deflate its performance metrics, impede its ability to operate existing stores optimally, preclude any

realistic opportunity for expansion or growth, and force it to exit the marketplace by making a sale to a preferred T-Mobile dealer.

d.  Upon information and belief, T-Mobile disproportionately imposed closures upon legacy Sprint dealers as part of its plan to eliminate, and have its preferred legacy T-Mobile dealers subsume, the unwanted Sprint dealers it acquired via the merger.

114.  T-Mobile also took actions calculated to damage Universal Wireless and other legacy Sprint retailers and to drive them out of the marketplace. That conduct included, without limitation, the following:

a.  As a condition of the "privilege" of doing business with T-Mobile, T-Mobile withheld Universal Wireless' rightfully-earned residual commissions under the Sprint ARA, which were significant.

b.  T-Mobile otherwise reduced or eliminated revenue streams that existed under the Sprint ARAs, which T-Mobile never represented would be impacted or changed under the new Agreement Package.

c.  T-Mobile made inequitable and inconsistent determinations about the timing and period for which it would impose chargebacks (*i.e.,* withholdings from commissions for items such as cancelled cell plans or returned products) and took an inordinate amount of time to resolve chargeback issues, which hamstrung Universal Wireless' ability to accurately document/forecast cash flow. In fact, T-Mobile continued chargebacks for customer deactivations for 180 days for the 23 stores T-Mobile closed while simultaneously confiscating all earned residuals payable to Universal Wireless for the same stores.

d.    T-Mobile conspired with Brightstar Corp. ("Brightstar"), which had been an affiliate and preferred accessories vendor of Sprint and became an affiliate of T-Mobile because of the merger, to allow Brightstar to drastically reduce Universal Wireless' credit limit and divert Universal Wireless' commissions to Brightstar.[4]

e.    T-Mobile prohibited Universal Wireless from selling accessories or phones it had acquired when it was a Sprint dealer, leaving Universal Wireless with hundreds of thousands of dollars in inventory that it could not sell (and which it had purchased on credit from Brightstar).   The inability to realize any revenue from this inventory represented a significant loss for Universal Wireless because the sale of such accessories was one of its major revenue streams.

f.    T-Mobile manipulated search engine results to divert internet traffic and potential customers away from Universal Wireless and instead to preferred legacy T-Mobile retailers and corporate stores.   Specifically, T-Mobile suppressed search engine results for Universal Wireless locations so they would not appear at the top of, or at all, in a search engine query for T-Mobile locations even though the internet user was located in close or closest proximity to a Universal Wireless store location.

g.    T-Mobile provided legacy Sprint dealers, such as Universal Wireless, only 2 REMO tablets per store (a device that allowed customer activations) while legacy T-Mobile dealers received multiple REMO tablets per store.   This

---

[4] Upon information and belief, this inured to the benefit of persons with interests in Sprint, T-Mobile, and Brightstar, such as Marcelo Claure.

ensured that legacy Sprint dealers such as Universal Wireless would fail at processing the volume of customer requests which not only caused Universal Wireless to lose commissions, but also caused those customers to leave Universal Wireless and go to legacy T-Mobile dealers for service.

h.  T-Mobile failed to provide appropriate signage for Universal Wireless.

i.  T-Mobile required Universal Wireless to enter into vendor contracts that were unreasonable and costly.

j.  T-Mobile imposed a lengthy "acquisitions freeze" that, in combination with T-Mobile's other acts of suppressing Universal Wireless, prevented Universal Wireless from pursuing acquisitions or selling its business. Upon information and belief, however, T-Mobile granted exemptions from its acquisition freeze for certain T-Mobile-favored retailers.

k.  When the supposed acquisition freeze was over, T-Mobile ignored or deferred Universal Wireless' growth-related requests. In short, T-Mobile not only reduced Universal Wireless' size, but also prevented it from recovering while supporting the growth of legacy T-Mobile dealers.

l.  Upon information and belief, T-Mobile also permitted other dealers similarly situated to Universal Wireless (in that they were owned by companies or individuals with common Boost ownership interests) to acquire new doors. Worse yet, another T-Mobile dealer was allowed to sell Boost (later Dish) products despite the exclusivity provision, and T-Mobile even allowed this dealer to purchase some of Universal Wireless' best stores.

m.      While citing proximity with other stores as a basis for the closures it imposed, T-Mobile placed T-Mobile-owned corporate stores in close proximity to Universal Wireless locations.

n.      Upon information and belief, after using bad faith and improper tactics to hinder the performance of Universal Wireless' existing stores, T-Mobile used those performance metrics (which T-Mobile wrongfully suppressed) as a pretext to eliminate those stores.

115.    Upon information and belief, T-Mobile knew it planned to take all of the aforementioned actions prior to Universal Wireless' execution of the Agreement Package but actively concealed and lied about those plans to induce Universal Wireless to sign the Agreement Package.

116.    In short, relying on the T-Mobile RSAs, (which it coerced and fraudulently induced Universal Wireless to sign) T-Mobile eliminated Universal Wireless' stores while simultaneously prohibiting Universal Wireless from opening new locations (because T-Mobile withheld its approval) or opening stores for a competing carrier (because the fraudulently induced T-Mobile RSAs prohibited competition in any form).

117.    Consistent with its intent and design, T-Mobile's anti-competitive, unfair, and deceptive conduct also ensured that Universal Wireless' remaining stores would not operate at the levels they did prior to the Sprint-T-Mobile merger.

118.    Prior to Universal Wireless executing the Wind Down Addendum and T-Mobile RSAs, T-Mobile and Sprint stated that a dealer's performance would be "the number 1 factor" for T-Mobile's future plans.

119. But upon information and belief, T-Mobile merged with Sprint for its network assets, not for its customers or its dealer distribution network, which included Universal Wireless, but communicated the opposite to dealers and concealed its true intent.

120. Throughout its relationship with Universal Wireless (and other legacy Sprint dealers), T-Mobile engaged in a pattern and practice of anti-competitive, unscrupulous, and unethical conduct, from which it then sought immunize itself through unfairly induced releases which were the product of misrepresentations, treachery, lack of consideration, and financial duress created by T-Mobile.

I. **T-Mobile's Unlawful Conduct Forced Universal Wireless to Exit a Business in Which it Had Flourished for Over 22 Years.**

121. Before it was forced to do business with T-Mobile, Universal Wireless was a vibrant small business that its ownership intended to continue to grow or to scale and sell. T-Mobile ruined either path for Universal Wireless' future.

122. Once it became clear that T-Mobile's actions would make it virtually impossible for Universal Wireless to survive, let alone succeed or grow, and would also force Marceco to sell its Boost interest, Universal Wireless had little choice but to exit the marketplace and sell its remaining business.

123. Upon information and belief, T-Mobile decided it would only allow a limited number of preferred dealers to grow by acquiring stores from other non-preferred dealers with T-Mobile's approval.

124. T-Mobile abused its approval power, which is used in combination with its store-closure and suppression activities, to limit the number of possible buyers and deflate the prices at which the dealers it suppressed could exit the marketplace.

125.    The circumstances further diminished the terms on which Universal Wireless could sell its business.

126.    Upon information and belief, T-Mobile colluded with its preferred dealers to deflate the sales prices for the assets of exiting dealers and engaged in activities designed to reduce the sales price of those dealers' assets.

127.    Upon information and belief, T-Mobile also advertised Universal Wireless' financial distress (that T-Mobile wrongfully caused) to certain "preferred" prospective buyers and told them to pursue acquiring Universal Wireless' assets at a reduced price.

128.    Faced with a fire-sale or T-Mobile's misconduct continually diminishing its business, Universal Wireless ultimately signed an Asset Purchase Agreement ("APA") with one of T-Mobile's preferred buyers ("the Buyer") to sell its assets at depressed pricing resulting from T-Mobile's anti-competitive conduct.

129.    Universal Wireless requested T-Mobile's consent to the APA sale, which, under the T-Mobile RSAs, T-Mobile could not unreasonably withhold. This would be another provision T-Mobile would abuse.

130.    First, in an email from Cody B. Welker to Mr. Aqel dated January 29, 2021, T-Mobile approved Universal Wireless' APA with the Buyer without stated conditions.

131.    Relying on this written approval, Universal Wireless made extensive decisions such as employee terminations and transitions.

132.    T-Mobile then took one last shot at Universal Wireless: a few days before the closing date under the APA and despite already approving the APA, T-Mobile informed Universal Wireless that it would withhold final approval of the transaction unless Universal Wireless signed

an Assignment and Assumption Agreement ("Assignment") that contained a putative general release of all of Universal Wireless' claims against T-Mobile.

133.    This putative general release was understandably a surprise to Universal Wireless, because T-Mobile's demand for the release was not reasonable (particularly since T-Mobile previously approved the sale in writing without it), and the release was not properly a condition of approval for sale under the T-Mobile RSAs.

134.    At this point, Universal Wireless had paid $1 million in escrow.

135.    T-Mobile intentionally waited to spring the release on Universal Wireless until just prior to the scheduled closing of the APA, knowing that Universal Wireless could not afford to refuse to sign the release and risk losing the deal.

136.    Universal Wireless did not know it at the time, but T-Mobile had (and likely still has) a pattern and practice of foisting surprise, last-minute releases on severely damaged dealers trying to exit the business.

137.    This roll-out of a putative release always came after the dealer was in no position to stop the sales transaction (which T-Mobile already fraudulently promised it would approve without additional conditions) because, among other reasons, related employee terminations or transitions and lease arrangements were already underway, and the selling dealer now faced a buyer who had rights against the selling dealer if it halted the transaction.

138.    In each case, the sale was only occurring in the first place because T-Mobile had devastated the selling dealer's business, thereby forcing the selling dealer to exit the business.

139.    When subjected to T-Mobile's illicit scheme, Universal Wireless' choices were simple: insolvency or fold to T-Mobile's unfair demands.

140.     For no consideration and under business compulsion and financial duress that
T-Mobile created, on March 26, 2021, Universal Wireless signed the Assignment, and on April 1,
2021, Universal Wireless and the Buyer closed the APA, with Universal Wireless making a
depressed asset sale.

**J.      Sprint, and Then T-Mobile, Maintained a Mislabeled Franchise Arrangement with
Universal Wireless.**

141.     Prior to the Sprint-T-Mobile merger, Sprint's relationship with Universal Wireless
was a mislabeled franchise relationship.

142.     Sprint's ARA with Universal Wireless included a false statement that the
relationship was not a franchise.

143.     After acquiring Sprint in the merger, T-Mobile unlawfully terminated Universal
Wireless' franchise with Sprint.

144.     Thereafter, T-Mobile's relationship with Universal Wireless was a mislabeled
franchise relationship.

145.     T-Mobile's RSAs with Universal Wireless included a false statement that the
relationship was not a franchise.

146.     Both Sprint and T-Mobile engaged in unlawful conduct directed at Universal
Wireless that violated applicable franchise law.

147.     Both Sprint and T-Mobile granted Universal Wireless and its locations the right to
offer, sell, or distribute goods and services – specifically Sprint and T-Mobile wireless services
and associated cellular phone products – under a marketing plan or system prescribed in substantial
part by Sprint and T-Mobile.

148.     That marketing plan included, without limitation, sales of Sprint- and T-Mobile-
branded goods and services through a network of independent authorized retailers, of which

Universal Wireless was one, established by Sprint and T-Mobile in territories also established by Sprint and T-Mobile, to create a distribution grid for Sprint and T-Mobile.

149.    Universal Wireless and other dealers were required to invest and take on substantial risk to commit them to the retailer and distribution programs established by Sprint and T-Mobile.

150.    Further, after the merger, T-Mobile forbade Universal Wireless from making independent sales of accessories, which reduced Universal Wireless' profitability by thousands of dollars (approximately $65,000) on a monthly basis.

151.    Universal Wireless' operation was substantially associated with the trademarks, service marks, trade names, advertising, or other commercial symbols designating, owned by, or licensed by Sprint, T-Mobile, and their affiliates.

152.    Indeed, to a customer visiting a Universal Wireless store, the store appeared to be a Sprint- or T-Mobile-owned store because of the extensive Sprint or T-Mobile signage and logos appearing on the employee uniforms -- all of which were mandated by Sprint and T-Mobile.

153.    Universal Wireless was required to pay to Sprint, and then to T-Mobile, directly or indirectly, franchise fees.

154.    Those franchise fees included, without limitation:

    a.    the improper withholding of Universal Wireless' rightfully earned residuals post-merger;

    b.    improper and unauthorized chargebacks against Universal Wireless' commissions and residuals due from Sprint and T-Mobile;

    c.    the forced-purchase of furniture, uniforms, services, phones, and accessories from Sprint- and T-Mobile-selected vendors, including Granite Communications and Brightstar, which vendors, upon information and belief,

provided these goods and services to Universal Wireless at a substantial mark-up that was directly passed on to Sprint or T-Mobile;

d.    the assessment of charges labeled as "penalties" or "fines" for items such as missed training for employees, staff shortages, or findings in audits conducted by or on behalf of Sprint or T-Mobile;

e.    the required surrender of returned phones to Sprint or T-Mobile without any refund to Universal Wireless for any portion of the phones;

f.    Sprint's and T-Mobile's receipt of funds from vendors in return for allowing those vendors to advertise in Universal Wireless stores;

g.    charges for Universal Wireless' sales of accessories (which did not reflect mere wholesale sales of accessories to Universal Wireless by Sprint and T-Mobile at wholesale);

h.    markups on shipping fees; and

i.    backend charges for co-op parts.

155.    Both Sprint and T-Mobile failed to properly register as required for franchise relationships and abused the franchise relationship with Universal Wireless.

156.    Further, Defendants unlawfully terminated the Sprint franchise with Universal Wireless when they forced the less favorable T-Mobile franchise relationship upon Universal Wireless.

**K.**    **T-Mobile is Liable for Sprint's Unlawful Conduct.**

157.    T-Mobile (or a parent company of T-Mobile) is the successor entity or parent of Sprint.

158.    As the acquiring entity, T-Mobile is liable for the actions or inactions of Sprint occurring before or in connection with the Sprint-T-Mobile merger.

159.    Further, as between Sprint and T-Mobile, there was a commingling of property rights or interests, and it was apparent that they were intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others.

160.    Upon information and belief, and by all appearances, T-Mobile and Sprint were in a conspiracy to commit the illegal acts complained of herein and they each aided and abetted the other in the perpetration and commission of the unlawful and wrongful actions and inactions that are the subject of this Complaint.

**L.    The Putative Releases Contained in the Sprint and T-Mobile Contracts are Unenforceable.**

161.    The putative releases, which T-Mobile drafted and placed in the Wind Down Addendum, the T-Mobile RSAs and in the April 1, 2021 Assignment between Universal Wireless, the Buyer, and T-Mobile (collectively, the "putative releases"), were fraudulently or unlawfully obtained and are unenforceable.

162.    The putative releases lack consideration.

    a.    For the Wind Down Addendum and T-Mobile RSAs, T-Mobile compelled Universal Wireless to forego its existing Sprint contractual benefits and granted Universal Wireless nothing in return beyond a reduction in what Universal Wireless was already entitled to receive.

    b.    For the Assignment, T-Mobile had already given written approval of the APA with the Buyer.

    c.    The last-minute putative releases were unilaterally imposed on the APA by T-Mobile, were not proper or authorized requirements for the APA process, and in exchange for executing them, Universal Wireless received nothing to which it was not already entitled.

163.    Separately, T-Mobile acquired the putative releases through unlawful coercion and duress that it imposed upon Universal Wireless, which independently renders the releases unenforceable because:

a.    For the putative releases in the Wind Down Addendum and T-Mobile RSAs, T-Mobile threatened the destruction of Universal Wireless' business if it did not sign, while simultaneously claiming Universal Wireless was still bound by its non-compete, chargeback, and other obligations under the Sprint ARA. Universal Wireless had millions of dollars in recurring obligations for lease payments, personal guarantees, wages, and operating expenses and it faced a simple choice: sign T-Mobile's rushed, non-negotiable adhesion contracts or go bankrupt.

b.    Similarly, for the Assignment, T-Mobile waited until the eleventh hour before the closing of the APA with the Buyer to produce the putative release and demand Universal Wireless sign it, knowing full well that Universal Wireless could not afford to lose the APA or delay the APA's closing while it challenged T-Mobile's improper demand for a release.

c.    Indeed, T-Mobile's modus operandi was to (1) first verbally approve and provide written email approval of dealers' sale of assets, like it did with Universal Wireless, and (2) wait until the last minute to spring the release, at which point T-Mobile knew Universal Wireless would be in no position to stop the sale because it had made extensive final decisions such as employee terminations or transitions and lease arrangements, and Universal Wireless would face the Buyer, who had rights against it if it halted the transaction.

d.      With all of its putative releases (and its putative contracts generally), T-Mobile operated to (and did) achieve a specific, calculated, and unfair objective: Universal Wireless' choices were insolvency or fold to T-Mobile's unfair demands.

164.    T-Mobile also induced all putative releases by fraud:

a.      T-Mobile affirmatively misrepresented its intentions (and concealed its true intentions) regarding store closures, lease renewals, growth, non-enforcement of its exclusivity clause in the T-Mobile RSAs and support from the outset.

b.      Then, after intentionally devastating the businesses of dealers like Universal Wireless, T-Mobile fraudulently represented it had approved the dealers' sales of their remaining assets to another T-Mobile dealer, but knew it intended to threaten to retract its approval at the last minute unless the selling dealer released all claims against T-Mobile.

165.    The putative releases also violate, and are invalid under, applicable franchise law.

166.    Further, to the extent the T-Mobile RSAs are deemed valid, the imposition of unreasonable and non-negotiable releases violated T-Mobile's obligation under the T-Mobile RSAs to forebear from unreasonably withholding consent to sales or assignments of Universal Wireless' stores.

167.    In short, T-Mobile acquired all the putative releases through unfair and deceptive practices, improper coercion and fraud, and without giving valid consideration, and in violation of other applicable legal requirements, all of which renders the putative releases void as a matter of law.

## COUNT I
### FRAUD AND FRAUDULENT INDUCEMENT
#### (by Universal Wireless and Marceco against both Defendants)

168.    Universal Wireless and Marceco re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

169.    Sprint and T-Mobile made misrepresentations to Universal Wireless and Marceco about the merger and the impacts of the merger, including the impact of the merger on store closures and operations and exclusivity clause enforcement and personal guaranty requirements.

170.    T-Mobile knowingly made the false representations to Universal Wireless and Marceco that it would not subject Universal Wireless to another significant reduction of its stores after the initial closure of 23 stores and would allow Universal Wireless to expand and grow.

171.    T-Mobile further concealed its plans to massively cut Universal Wireless' number of locations, suppress its ability to succeed, stifle its growth and preclude Marceco from operating a Boost business while Universal Wireless was operating a T-Mobile business.

172.    Further, T-Mobile made misrepresentations and concealed material information from Marceco and Universal Wireless regarding whether T-Mobile would allow Marceco to continue to operate its Boost business and the nature of the guarantees being sought relative to Universal Wireless.

173.    These representations and concealments were material and false.

174.    T-Mobile knew that the representations were false, and it acted in reckless disregard as to the truth or falsity of the representations.

175.    T-Mobile knew at the time it made the representations that it intended to close far more of Universal Wireless' stores than it represented, and that it would do so within the first 6 months of operation under the T-Mobile RSAs.

176. T-Mobile made these misrepresentations and concealments of material facts with the intent to deceive Universal Wireless, and they were made as a material inducement to Universal Wireless to sign the documents in the Agreement Package.

177. Universal Wireless was deceived by the misrepresentations and would not have signed the Agreement Package documents but for the misrepresentations.

178. Universal Wireless and Marceco could not have learned the true facts through reasonable diligence, and as a result, their reliance on T-Mobile's misrepresentations was justified and reasonable.

179. T-Mobile's fraudulent misrepresentations and concealments of material fact induced Universal Wireless to forego the more beneficial terms of the Sprint ARA and cheated Universal Wireless out of compensation to which Universal Wireless was entitled under the Sprint ARA.

180. As a direct and proximate result of T-Mobile's fraudulent misrepresentations, Universal Wireless and Marceco have suffered damages in an amount to be determined at trial, but certainly in excess of $50 million.

**COUNT II**
**INNOCENT MISREPRESENTATION**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless and Marceco against both Defendants)**

181. Universal Wireless and Marceco re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

182. Universal Wireless and Marceco plead innocent misrepresentation in the alternative to fraud and fraudulent inducement.

183. As alleged herein, Defendants supplied misinformation (by direct statement and concealment that misled Universal Wireless and Marceco concerning the nature of the T-Mobile-

Universal Wireless relationship), including about the Defendants' merger, future growth, store closures, exclusivity clause enforcement and personal guaranty requirements which information was material, false, and misleading.

184.   Defendants knew that supplying this information to Universal Wireless and Marceco would induce Universal Wireless to act by, among other things, acquiring new locations pre-merger and executing the new Agreement Package, and in supplying this information, Defendants intended to induce Universal Wireless and Marceco to do so.

185.   Defendants were negligent in obtaining and communicating this false information to Universal Wireless.

186.   Universal Wireless and Marceco reasonably relied on this false information in taking the actions by them described herein.

187.   T-Mobile's false information proximately caused damages to Universal Wireless and Marceco, and inured to the benefit of T-Mobile.

188.   As a result of T-Mobile's misrepresentations, Universal Wireless and Marceco have suffered damages in an amount to be determined at trial, but certainly in excess of $50 million.

## COUNT III
## MICHIGAN FRANCHISE INVESTMENT LAW M.C.L. §§ 445.1501. *ET SEQ.*
### (by Universal Wireless against both Defendants)

189.   Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

190.   Sprint and T-Mobile each had a business model and mode of operation such that their relationships with Universal Wireless during the relevant time periods for each were franchises as defined by M.C.L. §§ 445.1502(3)(a)-(c) in that:

a.  Sprint and T-Mobile granted Universal Wireless the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed substantially by the franchisor. Indeed, to a customer visiting a Universal Wireless store, the store appeared to be a Sprint- or T-Mobile-owned store because of the extensive Sprint or T-Mobile signage, branded marketing materials, and their logos appearing on the employee uniforms – all of which were mandated by Sprint and T-Mobile.

b.  Sprint and T-Mobile granted Universal Wireless the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating Sprint and T-Mobile.

191.   Universal Wireless paid franchise fees to Sprint, and then to T-Mobile, directly or indirectly. Those franchise fees included, without limitation:

a.  confiscated significant residuals to which Universal Wireless was rightly entitled from Sprint as a condition of Universal Wireless doing business as a T-Mobile retailer, including the withholding and reduction of Universal Wireless' earned residuals post-merger for the closed locations;

b.  confiscated commissions due to Universal Wireless, to pay T-Mobile affiliate, Brightstar Corp.;

c.  improper and unauthorized chargebacks against Universal Wireless' commissions due from Sprint and T-Mobile;

d.  the forced-purchase of furniture, uniforms, services, software licenses, phones, and accessories from Sprint- and T-Mobile-selected vendors, which vendors,

upon information and belief, provided these goods and services to Universal
Wireless at a substantial mark-up that was directly passed on to Sprint or
T-Mobile;

e.      the assessment of charges labeled as "penalties," "fees," "fines," or reductions
against commissions, residuals, or other amounts due to Universal Wireless for
items such as missed training for employees, improper training charges for
employees who attended training or canceled timely, per-employee training
fees for training sessions with less than a 90% completion rate, staff shortages,
early device activation, or findings in audits conducted by or on behalf of Sprint
or T-Mobile;

f.      the required surrender of returned phones to Sprint or T-Mobile without any
return to Universal Wireless for any phones for which Sprint or T-Mobile
charged or offset Universal Wireless' commissions, residuals, or other amounts
due to Universal Wireless;

g.      Sprint's and T-Mobile's receipt of funds from vendors in return for allowing
those vendors to advertise in Universal Wireless' stores; and

h.      charges to Universal Wireless for missing accessories and devices or demos,
which charges, upon information and belief, which are in excess of T-Mobile's
cost; markups on co-op shipping fees, uniforms, and required vendors and other
processing fees and backend charges.

192.    In offering and/or selling its franchise to Universal Wireless, T-Mobile violated
M.C.L. § 445.1505 by:

a.    Employing a scheme to defraud Universal Wireless by, for instance, concealing the truth about store closures that Universal Wireless would be subject to;

b.    Making untrue statements of material facts alleged herein and omitting to state material facts necessary in order to make the statements made not misleading; and

c.    Engaging in the anticompetitive conduct alleged herein.

193.    The provision in the T-Mobile RSAs requiring Universal Wireless to release its rights and protections provided in Michigan's Franchise Investment Law is void and unenforceable pursuant to M.C.L. § 445.1527(b).

194.    The provision in the T-Mobile RSAs permitting T-Mobile to terminate Universal Wireless prior to the expiration of its terms except for good cause is void and unenforceable pursuant to M.C.L. § 445.1527(c).

195.    Universal Wireless has suffered damages and is entitled to an award of damages thereof, including attorneys' fees, court costs, and interest as provided by M.C.L. § 445.1531(1).

## COUNT IV
## VIOLATION OF MICHIGAN'S CONSUMER PROTECTION ACT
### (by Universal Wireless and Marceco against both Defendants)

196.    Universal Wireless and Marceco re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

197.    In violation of Michigan's Consumer Protection Act ("MCPA"), M.C.L. § 445.903(1), T-Mobile engaged in "[u]nfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce."

198.    Defendants' conduct involved trade or commerce in that, pursuant to M.C.L. § 445.902(g), it involved "the conduct of a business providing goods, property, or service primarily

for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property."

199.    Defendants' actions as alleged in this Complaint violated M.C.L. § 445.903(1)(f), (n), (s), (aa), (bb), and/or (cc).

200.    Universal Wireless and Marceco are entitled to recover for T-Mobile's violations of the MCPA because "the intent of protecting consumers is well served by allowing suit to be brought by non-consumers who have a significant stake in the events." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 779 F. Supp. 2d 671, 681 (E.D. Mich. 2011).

201.    Universal Wireless and Marceco have been damaged by T-Mobile's violations of the MCPA and are entitled to recover damages in an amount to be determined at trial, plus attorneys' fees under the MCPA.

202.    Further, under the MCPA, the Court should issue an order that:

a.    Declares that T-Mobile's pattern and practice of misconduct as alleged herein are unlawful methods, acts, and practices that are unlawful under §3 of the MCPA;

b.    Enjoins, in accordance with the principles of equity, T-Mobile from engaging in such methods, acts, or practices that are unlawful under §3 of the MCPA.

**COUNT V**
**VIOLATION OF WASHINGTON UNFAIR BUSINESS PRACTICES—CONSUMER PROTECTION ACT, RCW §§ 19.86.010 ET SEQ.**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless and Marceco against both Defendants)**

203.    Universal Wireless and Marceco re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

204.    T-Mobile and/or Sprint engaged in unfair and deceptive trade practices including, among other things, the following:

a.   Making misrepresentations to Universal Wireless, the government and the public regarding the merger that created harmful effects;

b.   Making false representations to induce Universal Wireless to sign the Agreement Package and coercing Universal Wireless to do so or else forego the ability to sell any T-Mobile phones or services;

c.   Misrepresenting that Marceco could continue to own a Boost business while Universal Wireless acted as a T-Mobile dealer;

d.   Treating Marceco and Universal Wireless differently from other dealers and their affiliates, which were permitted to have both a Boost and T-Mobile dealership business;

e.   Engaging in anti-competitive conduct to disadvantage and drive out Universal Wireless (and other legacy Sprint dealers) while not subjecting legacy T-Mobile dealers to such conduct;

f.   Improperly influencing the purchase of and sales prices for the assets of legacy T-Mobile dealers;

g.   Committing misconduct that is not isolated – T-Mobile has engaged in a pattern and practice of committing the wrongful actions and inactions addressed in this Complaint – and is harmful to wireless dealers, employees, and customers;

h.   Representing in the Sprint ARA and T-Mobile RSAs that no franchise relationship would be created but in fact, creating such a franchise relationship with Universal Wireless, thereby manipulating the contractual relationship, and abusing Universal Wireless as a franchisee.

205.    Defendants' unfair and deceptive trade practices affect trade and/or commerce given that Defendants is/were engaged in the sale of assets, services, and commerce that directly affect the people of the state of Michigan.

206.    Defendants' unfair and deceptive trade practices affect the public because they:

    a.    Committed the anti-competitive acts in the course of their business;

    b.    Were part of a pattern or generalized course of conduct which involved the intentional devastation of dealers like Universal Wireless;

    c.    Their actions were not isolated and were instead a pattern and practice of wrongful actions and inactions that harmed not only dealers across the country, but also the public;

    d.    T-Mobile has driven several viable and successful businesses out of the marketplace;

    e.    T-Mobile has not complied with the letter and spirit of the representations that it made to state and federal authorities to obtain approval of the Sprint-T-Mobile merger;

    f.    Given T-Mobile's pattern, there exists an ongoing potential for T-Mobile to continue its unlawful conduct; and

    g.    T-Mobile's actions have affected and continue to affect a large number of consumers.

207.    Defendants' unfair and deceptive conduct is the actual and proximate cause of injury to Universal Wireless and Marceco and has caused damages to Marceco and Universal Wireless in an amount to be determined at trial, but certainly in excess of $50 million.

208.     Universal Wireless and Marceco are entitled to an award of damages caused by Defendants' unlawful conduct, including reasonable attorneys' fees and statutory treble damages as provided by RCW 19.86.090.

**COUNT VI**
**VIOLATION OF WASHINGTON FRANCHISE INVESTMENT PROTECTION ACT,**
**RCW §§ 19.100.010 ET SEQ.**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless against T-Mobile)**

209.     Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

210.     Sprint was a franchisor and unlawfully sold an unregistered franchise in the State of Washington in contravention of RCW 19.100.

211.     Upon information and belief, Sprint failed to file a Notice of Claim for Exemption under WAC 460-80-100 and, in any event, was not exempt from registration requirements.

212.     Likewise, T-Mobile is a franchisor and T-Mobile unlawfully sold an unregistered franchise in the State of Washington in contravention of RCW 19.100.

213.     Upon information and belief, T-Mobile has failed to file a Notice of Claim for Exemption under WAC 460-80-100 and, in any event, is thus not exempt from registration requirements.

214.     As the acquiring entity, T-Mobile assumed Sprint's liabilities.

215.     T-Mobile's business model and mode of operation is in fact a "franchise" as defined in RCW 19.100.010(6)(a) in that:

a.       T-Mobile granted Universal Wireless rights to engage in the business of offering, selling, and distributing goods and services under marketing plans pre-designed by T-Mobile;

b.     the business opportunity granted to Universal Wireless was substantially associated with a trademark, trade name, and other commercial symbols owned by T-Mobile; and

c.     T-Mobile collected disguised franchise fees from Universal Wireless, which included, *inter alia*, Universal Wireless' residuals, forcing Universal Wireless into a consignment model whereby Universal Wireless was forced to buy accessories from a particular vendor and then sell at T-Mobile's prices with substantially reduced margins and forcing Universal Wireless to buy phones from T-Mobile and no other source.

216.    Specifically, and without limitation, T-Mobile acted unfairly and deceptively and engaged in an unfair method of competition in violation of RCW 19.100.180, by:

a.     Failing to deal with Universal Wireless in good faith;

b.     Requiring Universal Wireless to purchase goods or services from T-Mobile or from an approved source of supply in the absence of any lawful purpose justified on business grounds;

c.     Unreasonably and arbitrarily discriminating between legacy T-Mobile dealers and legacy Sprint dealers, such as Universal Wireless, in business dealings;

d.     Requiring Universal Wireless to assent to a release or waiver which would relieve T-Mobile from liability imposed by RCW 19.100.180;

e.     Unreasonably and unnecessarily imposing on Universal Wireless standards of conduct such as forcing Universal Wireless to purchase security equipment that complied with only T-Mobile's specifications, mandating that new hires be

approved by T-Mobile, and mandating a minimum number of people on sales floors at all times;

f.   Refusing to renew without fairly compensating Universal Wireless for the fair market value and good will;

g.   Threatening to and actually terminating Universal Wireless' stores before the expiration of its terms without good cause; and

h.   Acting inconsistent with representations made to federal and state authorities concerning commitments not to shut down productive stores or reduce employment.

217.   As a result of T-Mobile's violations of franchise law, Universal Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $50 million.

218.   Universal Wireless has suffered damages by reason of T-Mobile's violation of RCW 19.100 and is entitled to an award of damages thereof, including statutory treble damages as provided by RCW 19.100.190(3).

**COUNT VII**
**DECLARATORY JUDGMENT**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless against both Defendants)**

219.   Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

220.   There is an actual and justiciable controversy among the parties regarding the matters set forth in this lawsuit.

221.   The law, justice, and equity require a determination and declaration that:

a.   As a result of Sprint's and T-Mobile's fraudulent inducement of the Agreement Package documents and as a result of the economic duress they created, those

documents are invalid, void, and of no effect, and Universal Wireless is entitled to the rights, privileges, and payments set out in, the Sprint ARA.

b.    The law, justice, and equity require a determination and declaration that the putative releases contained in the Wind Down Addendum, T-Mobile RSAs, and the Assignment and Assumption Agreement were procured through fraud and unfair and deceptive business practices, are the products of improper coercion and economic duress, are not supported by valid consideration, and are otherwise contrary to law, such that they are void and without effect.

c.    The relationships between Sprint and Universal Wireless, and then T-Mobile and Universal Wireless, were franchise relationships, such that Universal Wireless is entitled to the benefits of a franchisee under applicable law.

222.    Plaintiffs and Defendants have antagonistic interests in the subject matter of this dispute.

223.    There exists a current dispute and controversy between Plaintiffs and Defendants as to the aforesaid matters.

224.    There is a bona fide, actual, present need for the aforesaid declarations.

225.    All parties who have an interest in the matter are before the Court and the declaration is not sought purely for legal advice or curiosity.

226.    Plaintiffs respectfully request that this Court issue a judgment declaring that the rights and liabilities of the parties are as set forth above.

**COUNT VIII**
**BREACH OF SPRINT ARA CONTRACT**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless against both Defendants)**

227.    Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

228.    If the Court determines that the Sprint ARA remains in place, T-Mobile's and Sprint's conduct as alleged herein breached that contract.

229.    Defendants' conduct is the actual and proximate cause of damages to Universal Wireless.

230.    Universal Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $50 million.

**COUNT IX**
**BREACH OF WIND DOWN ADDENDUM AND T-MOBILE RSAs**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless against T-Mobile)**

231.    Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

232.    If the Court determines that the Wind Down Addendum and the T-Mobile RSAs remain in place, T-Mobile's and Sprint's conduct as alleged herein breached those contracts.

233.    T-Mobile's and Sprint's conduct is the actual and proximate cause of damages to Universal Wireless.

234.    Universal Wireless has suffered damages in an amount to be determined at trial, but certainly in excess of $50 million.

**COUNT X**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(IN THE ALTERNATIVE)**
**(by Universal Wireless against T-Mobile)**

235.    Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

236.    To the extent the T-Mobile RSAs are deemed to be valid contracts that T-Mobile did not fraudulently induce, then T-Mobile is obligated by contract and common law to act in good faith and to not do anything to deprive Universal Wireless of the fruits and benefits of those T-Mobile RSAs.

237.    T-Mobile breached this implied covenant of good faith and fair dealing and injured Universal Wireless' right to receive the benefits of the T-Mobile RSAs by engaging in the conduct described herein, including, without limitation:

a.    Systematically eliminating a disproportionate share of Universal Wireless' stores within the first 6 months of the T-Mobile RSAs;

b.    Refusing to approve additional Universal Wireless stores and building corporate stores in proximity to existing Universal Wireless locations; and

c.    Otherwise suppressing Universal Wireless' ability to succeed as described herein.

238.    T-Mobile's actions are contrary to Universal Wireless' reasonable and justified expectations under the T-Mobile RSAs.

239.    T-Mobile's sweeping reduction of Universal Wireless' stores and refusal to approve additional stores frustrated the essential purpose of the T-Mobile RSAs and Universal Wireless is unable to obtain its full and expected benefits of the T-Mobile RSAs, including without limitation, operating as a dealer of T-Mobile services and goods.

240.    T-Mobile used the Termination of Locations provision to constructively gut the essential purpose of the T-Mobile RSAs and to bind Universal Wireless and its owners to a non-compete agreement where they could not compete in the marketplace, all while T-Mobile continued to systematically eliminate Universal Wireless stores, refused to allow Universal Wireless to open new stores, and engaged in anti-competitive, unfair, and deceptive trade practices to guarantee that Universal Wireless' remaining stores failed.

241.    T-Mobile never intended to work with Universal Wireless. It only wanted signed T-Mobile RSAs that would constrain Universal Wireless and hopefully obviate Universal Wireless' ability to defend itself. Further, as T-Mobile possessed Universal Wireless' financial information, it knew before Universal Wireless signed the T-Mobile RSAs that its actions would effectively close down Universal Wireless' business.

242.    T-Mobile's abrupt and systematic reduction of Universal Wireless' stores, refusal to approve additional store acquisitions, and anti-competitive conduct to destroy Universal Wireless' remaining stores caused Universal Wireless to suffer damages in an amount to be determined at trial, but certainly in excess of $50 million.

## COUNT XI
## UNJUST ENRICHMENT, QUANTUM MERUIT, OR DISGORGEMENT
### (by Universal Wireless against T-Mobile)

243.    Universal Wireless re-alleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

244.    To the extent a contractual relationship is found to no longer exist between Defendants and Universal Wireless (because the Sprint ARA has expired and the T-Mobile RSAs are invalid), the Court should compensate Universal Wireless for its services, and the loss of its stores under the theories of unjust enrichment, quantum meruit, and disgorgement.

245.    T-Mobile received a benefit from the operation of stores and sales of Defendants'

goods and services and in forcing Universal Wireless to close its stores.

246.    These benefits were conferred at Universal Wireless' expense.

247.    Under the circumstances, it would be unjust for Defendants to retain the benefit

without fairly compensating Universal Wireless.

248.    Further, T-Mobile should be required to disgorge benefits flowing from its fraud.

249.    Universal Wireless is entitled to compensation or disgorgement in an amount to be

determined at trial, but certainly in excess of $50 million.

<b>PRAYER FOR RELIEF</b>

Accordingly, Plaintiffs respectfully request that the Court grant them the following relief:

A.    Award Plaintiffs monetary damages plus statutory treble damages, punitive

damages, equitable relief, attorneys' fees, and costs as allowed by law;

B.    Afford Plaintiffs a trial by jury; and

C.    Grant Plaintiffs such other and further relief as is just and proper.


                                    MILLER JOHNSON
                                    Attorneys for Plaintiffs


Dated: February 10, 2022            By _____
                                         James R. Peterson (P43102)
                                    Business Address:
                                         45 Ottawa Ave. SW, Suite 1100
                                         Grand Rapids, MI  49503
                                    Telephone:  (616) 831-1700
                                    Email:  petersonj@millerjohnson.com

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

UNIVERSAL WIRELESS, INC. and
MARCECO LTD.,

Case No. 22-01309-CB

        Plaintiffs,

v.

T-MOBILE USA, INC. d/b/a T-MOBILE,
and SPRINT SOLUTIONS, INC. d/b/a
T-MOBILE,

        Defendants.

---

James R. Peterson (P43102)
MILLER JOHNSON
Attorneys for Plaintiffs
45 Ottawa Ave. SW, Suite 1100
Grand Rapids, MI 49503
(616) 831-1700
petersonj@millerjohnson.com

---

## JURY DEMAND

    Plaintiffs, UNIVERSAL WIRELESS, INC. and MARCECO LTD., by their attorneys,

Miller Johnson, demand a trial by jury on all claims.

                            MILLER JOHNSON
                            Attorneys for Plaintiffs

Dated:  February 10, 2022        By _____
                            James R. Peterson (P43102)
                      Business Address:
                            45 Ottawa Ave. SW, Suite 1100
                            Grand Rapids, MI 49503
                      Telephone:  (616) 831-1700
                      Email:  petersonj@millerjohnson.com

# *NOTICE OF SELECTION:*
# *SPECIALIZED BUSINESS DOCKET*

- This case has been selected into the Specialized Business Docket, which is governed by Local Administrative Order 2018-03.

- You **MUST** immediately file an appearance in this case at www.accesskent.com/SBDFiling/.

- You **MUST** serve this notice along with the Summons and Complaint to all other named parties in this case.

- Beginning with your appearance and for **ALL** subsequent pleadings, you **MUST** use the e-filing portal for the Specialized Business Docket located at www.accesskent.com/SBDFiling/. For assistance with the e-filing system, call the Accesskent Help Desk at (616) 723-0043.

- **NO** pleadings will be accepted in paper form and **NO** Judge's Copies are required.

- **ALL** notices and copies of pleadings filed in this case will be received via the e-mail address you provide in your appearance.